ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
2021-Jan-15 13:38:56
60CV-21-349
C06D11 : 12 Pages

## IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
## _____ DIVISION

**DR. MELANIE JONES**                                                                  **PLAINTIFF**

**Vs.**                  **CASE NO. 60CV-21-_____**

**WELLPATH LLC**                                                            **DEFENDANT**

### COMPLAINT

Comes now the Plaintiff, Dr. Melanie Jones, by and through her counsel, Lloyd W. "Tre´" Kitchens, of The Brad Hendricks Law Firm, and for her Complaint states as follows:

1. Plaintiff is an individual resident of Pulaski County, Arkansas, and is a medical doctor licensed by the State of Arkansas.

2. Defendant Wellpath LLC is a foreign limited liability company doing business in Arkansas. Wellpath can be served by serving the registered agent, Corporate Creations Network, Inc., at 609 SW 8th St. #600, Bentonville AR 72712.

3. The events complained of herein occurred in Pulaski County, Arkansas. This Court has jurisdiction to hear this matter and is the proper venue.

### FACTS

4. Plaintiff worked for the Defendant as a medical doctor, treating inmates at various correctional facilities in Arkansas.

5. Wellpath LLC is located in Nashville, Tennessee, United States and is part of the Ambulatory Health Care Services Industry. Wellpath LLC has 6,000 total employees across all of its locations and generates $1.40 billion in sales (USD). There are 12 companies in the Wellpath LLC corporate family.

1

6.    On 08/07/2020 Plaintiff reported to Amy Dyer that her medical charts were being altered, without notification, consent of the Plaintiff, and without a clear source. *See attached* Exhibit #1.

7.    After the initial report of altered records, Plaintiff continued to regularly report to the Defendant her medical charts being altered without permission or consent. Those emails contain patient names and are therefore not attached as exhibits to this Complaint pursuant to A.R.C.P. 10(c).

8.    Employees of the Defendant used the Plaintiff's personal user ID and login to the medical record system, without the Plaintiff's permission, and ran reports and took other actions.

9.    Employees of the Defendant used the Plaintiff's personal user ID and login to run reports and work in areas of the Defendant's computer system where the Plaintiff never worked.

10.    Plaintiff made medical treatment decisions for her patients. These decisions were changed, or ignored by the Defendant. The Defendant took the following actions:

   a.    The Plaintiff's consult of a patient was deleted and replaced with false record. The Defendant then deleted the Plaintiff's refusal of "ATP - alternate treatment plan" and deleted emails instructing scheduler to proceed;

   b.    Plaintiff made a request for a patient to receive a brain CT on 05/22/2020. The patient is still waiting;

   c.    Plaintiff ordered non-formulary lab D-Dimer; not done and email regarding this was deleted. The patient did not get the test;

   d.    Plaintiff ordered echocardiogram for a patient. Defendant deleted the entire visit, and the patient did not receive the medically necessary test.

11.    The Defendant also systematically altered the Plaintiff's medical records, including but not limited changing vital signs, changed diagnoses, deleted some records, and made other alterations.

12. The Defendant deleted, modified or altered the medical records of no less than 14 high-cost patients due to outside consults, X-rays; or they were prescribed narcotics.

13. At least 40 chronic care visits were completely deleted, including the 6 "entries" documented in a run report - with zero time in eOMIS[1]. This is impossible in the system. The deletion of Plaintiff's record means there is no way of knowing what Plaintiff ordered or if the patient got anything - labs, medicines, imaging studies, etc.

14. On 09/02/2020, Plaintiff sent the Dr. Bill Ruby, an agent of the Defendant, a detailed correspondence laying out her issues with modification of her records. *See attached* Exhibit #2.

15. This correspondence specifically raised issues about the Defendant's ineffective care of COVID-19 patients. Id.

16. Plaintiff stated in part: "I cannot practice safe and effective medicine if I do not even have the assurance that my charts will remain untouched." Id.

17. In response to the Plaintiff's complaints the Defendant put her on "leave" on 10/16/2020.

18. While on leave, the Defendant took the Plaintiff's computer, denied her access to patient charts, denied her access to company emails, and locked her out of her medical practice totally.

19. Defendant fired the Plaintiff on 11/03/2020 over the phone.

20. By modifying the Plaintiff's charts, without approval or authority from the Plaintiff, the Defendant has put patient lives in danger, placed the Plaintiff's medical license in jeopardy, subjected the Plaintiff to possible civil liability, and damaged the Plaintiff's reputation.

## COUNT I
## RETALIATION - WRONGFUL TERMINATION

21. The averments contained within paragraphs 1-18, *supra*, are restated and incorporated herein by reference as if set forth now word for word.

---

[1] eOMIS is the electronic medical record system used in Arkansas by the Defendant.

3

22. An at-will employee may be terminated for good cause, no cause, even a morally wrong cause. There are four exceptions: 1) refusing to violate a criminal statute; 2) exercising a statutory right; 3) complying with a statutory duty; and 4) when the discharge is a violation of a well-established public policy of Arkansas as set by the legislature by statute or in the Constitution.

23. Plaintiff's termination by Defendant violated all four of these exceptions.

24. Failure to provide medical care pursuant to her medical license would have been a potentially criminal action by the Plaintiff.

25. Plaintiff refused to violate her oath, or be complicit in the harm to her patients.

26. As the medical doctor for the patients in question, the Plaintiff had a statutory right to provide appropriate medical care to those patients.

27. It was the Plaintiff's statutory duty to provide the patients in her care appropriate medical care.

28. The State has a due process obligation to provide appropriate medical care to persons in its custody. <u>City of Revere v. Massachusetts General Hospital</u>, 463 U.S. 239, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983); <u>West v. Atkins</u>, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988); <u>Singleton v. Norris</u>, 338 Ark. 135, 992 S.W.2d 768, 1999 Ark. LEXIS 332 (1999).

29. On information and belief the Defendant contracted with the State of Arkansas to provide the medical care required by both the due process clause of the Constitution and applicable case law.

30. The Defendant fired the Plaintiff in violation of all four exceptions to the at-will work doctrine in Arkansas, proximately causing her damages.

31. Defendant acted willfully and wantonly, knowing that it's retaliation against Plaintiff was in violation of public policy, and did so with the purpose to cause injury and damages, or did so with malice or reckless disregard of the consequences.

32. Defendant's wrongful discharge of Plaintiff is the proximate cause of numerous damages suffered by Plaintiff, including compensatory and punitive damages.

## COUNT II
## PRACTICING MEDICINE WITHOUT A LICENCE

33. The averments contained within paragraphs 1-30, *supra*, are restated and incorporated herein by reference as if set forth now word for word.

34. A.C.A. § 17-95-401 provides if any person who does not possess a valid license to practice medicine within this state and who is not exempted from the licensing requirements does any of the acts constituting the practice of medicine, he or she shall be deemed to be practicing medicine without complying with the provisions of the Arkansas Medical Practices Act, § 17-95-201 *et seq.*, § 17-95-301 *et seq.*, and § 17-95-401 *et seq.*

35. Agents of the Defendant, by modifying, changing and deleting the Plaintiff's medical records and orders, engaged in the practice of medicine without a license.

36. Such actions by the Defendant endangered patient care.

37. Such actions by the Defendant placed the Plaintiff's medical license in jeopardy, subjected her to potential civil liability, damage to her reputation, and career.

38. The actions of the Defendant directly and proximately caused damage to the Plaintiff.

## COUNT III
## OUTRAGE

39. The averments contained within paragraphs 1-36, *supra*, are restated and incorporated herein by reference as if set forth now word for word.

40. The Defendant willfully and wantonly engaged in extreme and outrageous conduct.

41. Such conduct proximately caused Plaintiff to sustain damages in the nature of emotional distress, bodily harm, and the other damages outlined herein.

42. The Defendant knew or should have known in light of surrounding circumstances that the Defendant's conduct would naturally and probably result in emotional distress and bodily harm but continued conduct in reckless disregard of the consequences.

43. Such conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and is regarded as atrocious and utterly intolerable in a civilized society.

44. Defendant proximately caused Plaintiff to suffer emotional distress that meets the requirements of the tort of outrage and AMI 401. Plaintiff suffered other damages as well which for the sake of brevity, are outlined below.

## COUNT IV
## IDENTITY THEFT

45. The averments contained within paragraphs 1-44, *supra*, are restated and incorporated herein by reference as if set forth now word for word.

46. The Defendant, by using the Plaintiff's unique log-in for the medical records system stole the Plaintiff's identity.

47. The Defendant, by changing the Plaintiff's medical records for her patients stole her identity.

48. The Defendant used the Plaintiff's unique identifying information for the Defendant's gain and to the Plaintiff's direct detriment.

49. The Defendant's identity theft is a direct and proximate cause of damages to the Plaintiff.

WHEREFORE, Plaintiff prays for a judgment against the Defendant related to compensatory damages for:

      a.     Lost wages;

      b.     Emotional distress;

      c.     Loss of reputation;

      d.     Attorney's fees and costs; and

      e.     All other just a proper relief.

The amount of compensatory damages should be determined by a jury and exceeds the minimum amount for Federal Diversity of Citizenship cases ($75,000).

Plaintiff also prays for punitive damages to punish the Defendant for the offending conduct and to deter others from such similar conduct. The amount of punitive damages should be determined by a jury and exceeds the minimum amount for Federal Diversity of Citizenship cases ($75,000).

PLAINTIFF PRAYS FOR A JURY TRIAL.

                                Respectfully Submitted:

                                The Brad Hendricks Law Firm
                                500 C Pleasant Valley Drive
                                Little Rock, AR  72227
                                (501) 221-0444 (P)
                                (501) 661-0196 (F)
                                tkitchens@bradhendricks.com

                                By: /s/ Lloyd W. "Tré" Kitchens
                                Lloyd W. "Tré" Kitchens, ABN 99075

## VERIFICATION

I have read the above and foregoing Complaint and it is true and correct to the best of my knowledge and belief. Wherein I set my hand and seal this day, January 15, 2021.

_____
Dr. Melanie Jones

STATE OF ARKANSAS    )
                     )ss
COUNTY OF PULASKI    )

Sworn to and subscribed before me, a Notary Public, on this day, January 15, 2021.

_____
NOTARY PUBLIC

My Commission Expires: _____

AUDRA L. MURRAY
MY COMMISSION # 12367826
EXPIRES: October 2, 2028
Pulaski County

8

I just wanted to forward the information.. I realize that Arkansas Eomis is not fully integrated into Wellpath's system - but, I felt like this was a substantial concern and wanted to keep all parties aware.
Thanks!

**From:** Melanie Jones
**Sent:** Friday, August 7, 2020 1:37 PM
**To:** Amy Dyer
**Cc:** michelle@humphrieslaw.net
**Subject:** computer error

Amy,
Thank you so much for working with me this morning. As described to you, I found that my eomis documentation had been altered - without notification, and without a clear source. I cannot emphasize how concerning this is - as this results in an inaccurate and permanent legal medical record - now attached to my name and login. Please describe the "bug", apparently previously identified, that somehow transposes information from one patient's chart to another? I am mortified; I have no idea how many of my charts have been affected. Further, as you mentioned, there is clearly something else occurring within the system - allowing something or somebody to make very specific changes within a patient's record (today's example - I entered "RLE cellulitis" in the *assessment* block of the provider follow-up template...I opened the document just a few hours later and found that this had been replaced with "RLE fx"). I am uncomfortable using eomis at this point. As you suggested, I will print my records immediately upon completion and keep these for reference. This is a massive breakdown and potentially devastating for our providers and for our company - I am copying this correspondence to IT. I am hopeful that someone will look deeply into this matter and provide an explanation as well as a solution. Also, I am including Michelle Odum and Brent Eubanks, as this situation leaves us open to massive legal consequences.
Thanks again for your help!



September 22, 2020

MELANIE JONES, MD

521 President Clinton
Ave; unit 1302
Little Rock AR72201

Bill Ruby, MD
WellpathCare
1283 Murfreesboro Road
Nashville, TN 37217

Dr. Ruby and administration,

I am writing to inform you of recent occurrences in my workplace, the Arkansas Department of Corrections (specifically, the Wrightsville unit). I am aware that patient's records are being falsified or deleted. I am ignorant as to who is responsible and to why this is being done - I only know that it is. I became aware of this approximately one month ago, when I noticed discrepancies in one of my own patient's chart...

On the day of August 7, 2020, I placed an entry into a chart and signed off. I returned to the chart hours later (as I had decided to transfer this man to an outside hospital) and viewed the note placed that morning - I found that the diagnosis had been changed. I immediately reported this to my regional IT department and was instructed to continue working while they monitored for any suspicious or abnormal activity. I was told at the end of the day that a problem had been identified, but that it was likely a "glitch" that somehow transposed pieces of information between any chart that was opened on the same day (similar to a clipboard?). I was assured that IT was working to correct this, and I was instructed to simply print each visit as I completed them for reference. I sent a follow-up email on this for clarification, including both eOMIS and WellPath IT members in the correspondence. I was instructed not to include WellPath in any further communication regarding the situation, as it had been determined an eOMIS error. As would be expected, I was alarmed to hear that our records system was flawed to such an extent and requested that our other providers be made aware - I was told that this would be left up to our regional medical director, Dr. Jeffrey Stieve, who has since been terminated. In my concern, I felt compelled to scan through my most recent documentation, checking for accuracy. I attempted to run a report through eOMIS, "user session statistics", thinking it would provide a history of logged visits (this can be run monthly). I found that someone had previously created and downloaded this - using my login ID. I reached out directly to eOMIS IT and received confirmation, via email, that someone had indeed obtained and used my login information (several others were included in this email, and I have retained a copy). I was told by my regional department that the matter would be investigated. I have heard nothing further, even after two additional requests.



EXHIBIT 2

During this time, I contacted Michelle Odum, a defense attorney who works on our behalf in claims involving ADC. I have come to know her quite well over the years and have the utmost respect for her knowledge and integrity. I was asking only for guidance in this situation, and her limited response was to take my concerns to and through the proper chain of command. As days went by, I discovered other altered records and have kept a log of these. I followed the advice of Ms. Odum and continued to inform my regional department of the changes; I called, texted, and e-mailed requests for any updated information on the software "malfunction". I was told that Marquis had been reviewing the case and found nothing specific.

In addition to saving my visits, I was saving all email communication regarding the situation and had moved it to a file labeled "regional correspondence". Alarmingly, I noticed changes to this as well; I determined that these had been copied and forwarded to an outside email address "melajones66@gmail.com", which I did not create and have never accessed. This was somehow also tied to my personal email address and to my cellular phone. Examining my phone, I saw contacts that I do not know and even calls that I had not placed. Upon discovering this, I became fearful that both my personal and work information had been accessed and compromised. On the morning of August 14th, I reported this to the FBI and immediately afterward informed my regional team. The computer was taken from my office within hours and taken to Pine Bluff (regional headquarters) for inspection; it has not been returned. August 15th, my login information was again used, but on a computer located at Hawkins - our women's unit (a separate building on the same large compound). I was not onsite at that time; this was reported and ignored.

Since then, I have found other discrepancies and have reported them each time - including emails and files regarding controlled substances. There is at least one patient who was prescribed buprenorphine (through me) whose records were changed and the information is inconsistent. I have reached out to the Board of Pharmacy on this matter and was assured that this would be researched.

Most recently, I was instructed by my administrator to review the back-log of chronic care visits missed during our very long and massive covid19 outbreak (which, thankfully, appears to be dwindling). We, like other units hit very hard, had been focused on caring for our acutely ill (we lost one patient of the five hundred plus infected). ADC and medical staff has been strained, and multiple barracks have been locked down for months. It became virtually impossible to hold the auto-scheduled chronic care clinics, where typically stable patients come in for a brief visit and routine concerns are addressed (much like a community clinic would schedule quarterly, semi-annually, etc). I was presented with a list of patients who were due in June, July, or August and was

told that a record should be made for these missed visits. Agreeably, I felt that it was appropriate to review these charts to ensure important labs, X-rays, consults, medicines, restrictions, etc had been addressed (often, patients transfer to other facilities with open-ended orders). I entered these tagged as "late entry/chart review" - the chronic care issue was identified, and then a summary was included of: pertinent diagnostics, medications, any additional active orders (such as restrictions), pending consult requests, and recent sick-calls, walk-ins, or other onsite visits that warranted follow-up. If there were areas of concern or if the patient was seen, I placed a separate entry with the current date and time for accuracy. Suspiciously, an email was sent from the regional office to my administrator only one day after the bulk of these reviews were uploaded, accusing me of backdating actual encounters and orders. This was clearly a calculated and malicious attack on me - a messy one - as my documentation had been altered and was wrought with mistakes - deletions were made, orders were moved or replaced, etc. I immediately brought this to the attention of everyone that had been included in the accusatory email - and got no response from anyone. The following day, I heard nothing...still nothing by the next afternoon, Friday Sept 18th, until I inquired as to the status of the matter and received a brief "still working on it"...as of today, nothing. I am now working in an obviously hostile environment. Frankly, it is terrifying that my patients - and I - are defenseless against whatever is happening. I cannot practice safe and effective medicine if I do not even have the assurance that my charts will remain untouched. Stealing my identity and altering my records risks so much more than my professional reputation - it risks lives. This is direct and reckless endangerment of my patients. I am equally distressed and concerned for my staff - who are following orders that may or may not even be there tomorrow. All of these individuals depend on me - which is a privilege and a gift that I cannot allow to be compromised. I have followed the chain of command, but the chain is broken. I am pleading for you to acknowledge this, to give it the urgent attention it requires, to right any wrongs, and to stop it from happening again.

Sincerely yours,

Melanie Jones, MD